A90A0909. NORTH GEORGIA ELECTRIC MEMBERSHIP CORPORATION v. CITY OF DALTON.
(398 SE2d 209)

BIRDSONG, Judge.

The North Georgia Electric Membership Corporation (NGEMC) filed a petition before the Georgia Public Service Commission to enjoin Dow Chemical Company from obtaining electrical power from another supplier, appellee City of Dalton, Georgia, to Dow's new styrofoam plant adjacent to the Dow latex facilities already serviced by NGEMC. The arguments presented by NGEMC include its posture as having been the sole supplier for the territory wherein Dow's operations are situated; and the contention that the subject area is part of a "municipality" as defined in OCGA § 46-3-3 (5) (A) known as "Industrial City" and chartered by Act of the General Assembly and signature of the governor on May 29, 1973, and therefore NGEMC is the only eligible supplier for that "municipality"; and that Industrial City is not a "wholly new municipality" coming into existence *after* May 29, 1973 so as to allow other suppliers to operate therein. See OCGA § 46-3-3 (13).

Principally, however, NGEMC contends that whether, in fact, Dow Chemical had the right to elect among several electrical suppliers pursuant to any interpretation of the statutes just cited, nevertheless Dow Chemical *did choose* NGEMC as its electrical power supplier by a written request and series of correspondence, resulting in a purchase order and actual performance of NGEMC in laying the facilities to supply the power.

The PSC ruled against NGEMC on the questions of eligibility of other suppliers, and found from the evidence of the letters, correspondence, and acts of the parties, that "[i]t was not Dow's intent to choose [NGEMC] as its electric supplier for the new facility. While an exchange of letters can constitute a contract, the letters do not make reference to the selection of an electric supplier but rather make reference to the selection of [NGEMC] as an electrical contractor. It is therefore found as a matter of fact that Dow Chemical did not choose [NGEMC] as its electric supplier for the new styrofoam facility."

The PSC's rulings constitute findings that the subject letter or agreement of Dow and NGEMC was directed only upon the constructing or laying of *facilities* for the carriage of power, and not for the supplying of electrical *power*.

The Superior Court of Fulton County affirmed the ruling of the PSC, and NGEMC appeals. *Held*:

The PSC ruled that in the facts of this case Industrial City was not a "municipality" within the meaning of OCGA § 46-3-3 (5) (A), and concluded that Industrial City was a "wholly new municipality" within the meaning of § 46-3-3 (13). Assuming arguendo the correctness of this ruling, so that NGEMC was not the sole eligible supplier of electricity for Dow's new styrofoam plant and Dow could thus choose among several bidding suppliers, this case nevertheless must be reversed.

The PSC erroneously applied the rules of legal construction to the correspondence and actions of appellant NGEMC and Dow. Clearly Dow and NGEMC did assent to contract for the supplying of electrical *power* and not merely for the "construction of facilities" for the conduction of power. The legal test for mutuality of assent to contract or meeting of the minds requires the application of "an *objective theory of intent* whereby one party's intention is deemed to be *that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent.*" (Emphasis supplied.) *Cox Broadcasting Corp. v. Nat. Collegiate &c. Assn.*, 250 Ga. 391, 395 (297 SE2d 733).

The initiating letter from an Ohio division office of Dow to NGEMC written April 10, 1987, stated: "I am writing you at the suggestion of Mr. David Creekmore, your representative to the Dow Chemical Company Dalton Plant. . . . Dow plans to construct a new process facility at the Dalton location which will require installation of [two new transformers]. . . . *To supply the two new transformers, we would like to tap into the existing 12.47 KV line* and run overhead to a pole located in the proximity of the transformers. [Specifications deleted.] [C]ables would be run down the pole and under-

ground to the transformer primaries. . . . As in the past, it is felt that the most expeditious approach to *providing primary power to these transformers would be to engage your organization for these services, using your standard practices and specifications with the right of review prior to construction.* . . . Present scheduling calls for *energizing the transformers* at the end of October 1987 and *gradual ascension to full load* at the end of March 1988. [Specifications query deleted.] I would appreciate being advised of the following . . . 1. Are there any objections to the *proposed method of supplying power* to the transformers. . . . 2. Is your organization in a position to *undertake the construction of the primary supply* from the point of connection *at existing 12.5 KV line to connections to the transformer primaries*, supplying the labor, materials and equipment required, within the time frame indicated above[?] [Specifications query deleted.] Yours very truly, Joseph P. Lacey, Electrical Engineer [Dow]." (Emphasis supplied.)

NGEMC promptly replied to Mr. Lacey of Dow in Ohio: "There is no objection to the method of *supplying power to the two new banks* [as you specified]. . . . *NGEMC would work with Dow in any way possible in doing this project.* . . . NGEMC would do all the overhead work *and make the UG connections.* I feel that *NGEMC, working with your contractor, could make the October 1987 deadline. I would like to ascertain the fact that all new transformers installed be dual voltage, since this area will be 25KV shortly.* [Specification reply deleted.] Sincerely, Richard Berryhill, System Engineer." (Emphasis supplied.)

Thereafter, on April 20, 1987, Mr. Lacey of Dow wrote Mr. Berryhill of NGEMC: "Thank you for your letter of April 14. . . . Mr. Creekmore . . . indicated that it was your practice to [install specified equipment]. . . . Attached [are data for proposed equipment]. . . . If acceptable to you, this is the device which Dow would furnish for installation by NGEMC [otherwise] a comparable switch . . . should be included in your part of the work. As the delivery time on this item is 16-18 weeks, I would appreciate your views as soon as possible. . . . [Further specifications deleted.]. . . Sincerely, William Lacey."

Dow then issued to NGEMC a series of purchase orders, and NGEMC laid and constructed the facilities for conduction of power as far as it was able pending Dow's completion of its part of the work.

But, on October 5, 1987, Dow sent NGEMC a letter asking for quotations of power rates, and stating: "If acceptable quotations are received, Dow will award contract by October 15, 1987."

Thereafter, Dow awarded to the City of Dalton a contract for the supplying of power. The City proceeded to construct more than seven miles of line from Dalton to Dow's plant; Dow disposed of the two transformers Dow had purchased to connect to the 12.47 KV line

through which NGEMC supplied primary power to Dow's latex facilities.

NGEMC had in the past performed construction and repair of *facilities* by purchase order for Dow, but obviously this was always in connection with *power supplied* by NGEMC to Dow's latex plant on Dow's existing 12.47 KV line, for it is conceded that NGEMC was the sole supplier of power to Dow until the present time. Therefore, the fact that purchase orders appear to refer to construction and not to supply of power, does not prove Dow never intended NGEMC to supply the power, or negate its request to assent to NGEMC's supplying the power.

According to certain ordinary facts, the inquiries and correspondence of Dow can allow but one patent conclusion: that it would, and intended to, "tap into" NGEMC's *primary power* source being then supplied by NGEMC on Dow's existing 12.47 KV line; and to connect its transformers so as to transform power directly into the plant from NGEMC's primary power source. Dow's initial letter stated unequivocally that it intended to tap into the main power line through which NGEMC supplied power, to provide power to Dow's transformer, and "the most expeditious *approach to providing primary power* to [our] transformers would be to engage your organization for *these services. . . . * Are there any objections to the proposed method of *supplying power* to the transformers?" There is no reasonable objective meaning in this language except that Dow intended and requested to *extract primary power* from the existing line, through which power was supplied by NGEMC, straight to its transformers leading to the plant, and intended to use NGEMC's methods and that power line to *supply power* to the plant. Why would Dow ask for, and specifically issue purchase orders for, construction of a power line from the primary power source supplied by NGEMC to Dow's transformers, if not *to obtain power* from that line? Dow requested the line be built from the primary power source supplied by NGEMC to its transformers, and watched NGEMC perform the physical construction necessary to conduct that power and to "energiz[e] the transformers at the end of October and [gradually ascend] to full load at the end of March 1988."

It is not objectively or subjectively reasonable for any party to imagine that all this language, and this undertaking of building lines from *the primary line* to which power was supplied by NGEMC, were mere whimsical exercises to construct lines that would perhaps never be used. Nor is it reasonable to imagine, as appellant seeks to persuade and as the PSC found, that after NGEMC built all this "construction" and "facilities" of a line from the 12.47 KV line, to which power was supplied by NGEMC, some other supplier might be allowed to tap into the line supplied by NGEMC at that end point and

then be called the "supplier?" Obviously these are not reasonable premises, for the City of Dalton could not have used the facilities without paying NGEMC for the power coming from the primary power 12.47 KV line, and in fact proceeded to build its own line.

Without saying too much by way of making factual conclusions, we think that *even without the specific reference to NGEMC's "supplying primary power, etc.,"* the position taken here by appellee, to wit, that NGEMC was merely asked for and paid to build useless power lines, is untenable. In fact, Dow's letters and manifestations of assent clearly refer to the construction of facilities as a necessary and exclusive preliminary to the only objective result: that NGEMC was being asked to supply the power through the lines it was asked to build.

Even Dow's witness admitted that a fair reading of Mr. Lacey's April 10, 1987, letter would be that Dow wanted and intended NGEMC appellant to serve the styrofoam plant; and this could only mean NGEMC was to supply *power*, for that is all that could be conducted on those lines, and NGEMC is the only supplier that was conducting power on the existing 12.47 KV line.

We must conclude that the "objective intent" standard of "a reasonable party's understanding" propounded in *Cox Broadcasting Corp.*, in ascertaining mutual assent in a contract, was not correctly employed in this case. While the PSC concluded that Dow "never made reference to the selection of an electrical *supplier*" (emphasis supplied), application of these standards in the *Cox Broadcasting* case lead inexorably to the conclusion that Dow was, in fact, referring to nothing else. And for that matter, Dow never, until after NGEMC's substantial performance of constructing the lines, suggested it might choose another supplier and that thus NGEMC's building would amount to nothing.

We have no disagreement with any policy consideration exercised by the PSC in concluding that Dow could choose among suppliers, but we think the evidence here tends to show the reasonable party can only conclude that Dow *did* choose. The matter must be viewed from the legality of the contract principles involved; policies favoring freedom to compete and to choose a utilities supplier do not contravene ordinary contract law by allowing the consumer to solicit, assent, agree, and obtain substantial performance under mutual contract and then change its mind.

The evidence in this case as to the letters and actions of the parties must be examined again, or put to the jury if appropriate, under the "reasonable understanding" standard of *Cox Broadcasting Corp.*, supra. This issue cannot be decided by a subjective announcement that "Dow had no intent," if the objective evidence reasonably shows it did. *Cox Broadcasting Corp.*, supra.

*Judgment reversed and case remanded for reconsideration. Banke, P. J., and Cooper, J., concur.*

ON MOTION FOR REHEARING.

North Georgia Electric Membership Corporation (NGEMC) has filed a Motion to Revise, asking this court to hold as a matter of law that Dow Chemical contracted with NGEMC to supply power to its new styrofoam plant, based on the letters of contract exchanged between Dow and NGEMC. City of Dalton has filed a Motion for Rehearing, insisting this court's ruling cannot stand because it is contrary to the PSC's finding of fact that Dow had no intent to contract with NGEMC to "supply power." The PSC's finding of fact that Dow had no (subjective) intent to contract with NGEMC to supply power cannot be sustained where, in so finding, the PSC employed an erroneous standard of law. It is a purely circular contention for the appellee to urge that a "fact" found by the PSC on an error of law can control or supersede a ruling on appeal that an error of law was employed in the finding of the "fact."

We held that *the letters exchanged between Dow and NGEMC*, when examined under the test clearly set forth in *Cox Broadcasting Corp. v. Nat. Collegiate &c. Assn.*, 250 Ga. 391, 395 (297 SE2d 733) lead to no reasonable conclusion except that Dow Chemical requested NGEMC to build facilities to supply power to its styrofoam plant *and to supply power via those facilities.*

According to the Supreme Court in *Cox Broadcasting*, supra at p. 395, "In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent." According to one of Dow's own executives, these letters would evince to the reasonable man the intent to request NGEMC to *supply power*; and, according to the evidence, Dow observed NGEMC construct the facilities up to the point of full compliance on the part of NGEMC except for "throwing the switch," waiting only for Dow to install the specified transformers leading directly to its plant.

We rejected in the opinion, and reject again, the appellee's argument that the letters only requested NGEMC to "construct facilities." The letters did request NGEMC to "construct facilities," but this was in the context of NGEMC's supplying power via those facilities. It is unreasonable to argue otherwise, especially since it is not suggested that anything could be done with those facilities except to obtain the power from NGEMC, and since the evidence does not

show NGEMC ever built facilities for Dow except for and in connection with the supplying of power by NGEMC.

The case was remanded to the PSC for examination *consistent with* our ruling as to the objective meaning of the letters pursuant to *Cox Broadcasting*. While *the letters* evince no reasonable objective meaning except that Dow intended to and did request and agree with NGEMC to supply power to Dow's new plant, the PSC may determine whether there is extrinsic evidence mitigating or negating the enforceability of a contract. *Cox Broadcasting*, id. For example, the City of Dalton asserts it is "understandable" that NGEMC does not want the PSC to reexamine this evidence, because when NGEMC negotiated the agreement with Dow, "NGEMC did not advise Dow of its rights to choose a different supplier than NGEMC for the styrofoam plant. . . ." This is a matter unrelated to the issues in their present posture, but clearly if the appellee intends to suggest and if the PSC finds there was a legal duty upon NGEMC to "advise" Dow of Dow's right to choose a different supplier, or if the PSC finds that NGEMC misled Dow in violation of some clear legal duty, then the case may be reexamined as to whether the contract between NGEMC and Dow was enforceable as it stood. Any such legal decision by the PSC will be reviewable. The posture of this appeal, however, is such that we can only rule that a contract did exist between Dow and NGEMC for the supply of power, and that unless some prepossessing fact renders this contract unenforceable, the choice made by Dow via these letters with NGEMC is binding, consistent with the PSC's interpretation of the Territorial Act. See *Jackson Elec. &c. Corp. v. Ga. Power Co.*, 257 Ga. 772, 773 (364 SE2d 556).

*Motion for rehearing denied.*

DECIDED SEPTEMBER 4, 1990 —
REHEARINGS DENIED OCTOBER 26, 1990 — 

*James C. Brim, Jr., Robert C. Richardson, Jr., Kinney, Kemp, Pickell, Sponcler & Joiner, L. Hugh Kemp*, for appellant.

*McCamy, Tuggle, Rollins & Fordham, Carlton C. McCamy, Mollie F. Glitsis, Michael J. Bowers, Attorney General*, for appellee.